UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| DAVID L. HORTON,<br><br>        Plaintiff,<br><br>   v.<br><br>JO ANNE B. BARNHART, Commissioner of Social Security,<br><br>        Defendant. | CASE NO.   C04-5676FDB<br><br>REPORT AND RECOMMENDATION<br><br>Noted for July 29, 2005 |

Plaintiff, David L. Horton, has brought this matter for judicial review of the denial of his application for disability insurance and supplemental security income ("SSI") benefits. This matter has been referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Magistrates Rule MJR 4(a)(4) and as authorized by Mathews, Secretary of H.E.W. v. Weber, 423 U.S. 261 (1976). After reviewing the parties' briefs and the remaining record, the undersigned submits the following report and recommendation for the Honorable Franklin D. Burgess' review.

FACTUAL AND PROCEDURAL HISTORY

Plaintiff currently is fifty-three years old.[1] Tr. 44. He has a ninth grade education and has past work

---

[1] The plaintiff's date of birth has been redacted in accordance with the General Order of the Court regarding Public Access to Electronic Case Files, pursuant to the official policy on privacy adopted by the Judicial Conference of the United States.

REPORT AND RECOMMENDATION
Page - 1

experience as a boiler maker, painter and tire mechanic. Tr. 77, 370.

On May 12, 1992, plaintiff protectively filed applications for disability insurance and SSI benefits, alleging disability as of July 1, 1991. Tr. 25, 328. Both applications were denied initially and on reconsideration. Tr. 44-45, 48-51, 53-55, 332-40. No further review of these applications was sought by plaintiff. Tr. 25.

On January 23, 1997, plaintiff again filed applications for disability insurance and SSI benefits, alleging disability as of December 31, 1990, due to chronic pain in his neck, back, arms and hips, cervical myeloradiculopathy, and right-sided radiculopathy at the S1 level in his spine. Tr. 25, 68, 341. Both applications were denied initially and on reconsideration. Tr. 46-47, 56-59, 61-63, 346-54.

Plaintiff requested a hearing, which was held before an administrative law judge ("ALJ") on April 5, 1999. Tr. 367. At the hearing, plaintiff, represented by counsel, appeared and testified, as did a medical expert and a vocational expert. Tr. 367-401. Also at the hearing, plaintiff amended his alleged onset date of disability to September 1, 1995. Tr. 369. On June 1, 1999, the ALJ issued an opinion, determining that plaintiff was not disabled. Tr. 32-34. Specifically, the ALJ found in relevant part that:

(1) at step one of the disability evaluation process, plaintiff had not engaged in substantial gainful activity;

(2) at step two, plaintiff had a "severe" impairment consisting of degenerative disc disease;

(3) at step three, plaintiff's degenerative disc disease did not meet or equal the criteria of any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1;

(4) at step four, while plaintiff retained the residual physical capacity to perform a modified range of light work, he was unable to perform any of his past relevant work; and

(5) at step five, plaintiff was capable of performing other jobs existing in significant numbers in the national economy.

Tr. 31, 33-34. The ALJ also found that because plaintiff had amended his alleged onset date of disability to September 1, 1995, his prior applications for disability insurance and SSI benefits were administratively final, and, therefore, could not be re-opened. Tr. 25, 33. On February 9, 2001, the Appeals Council denied plaintiff's request for review, making the ALJ's decision the Commissioner's final decision. Tr. 11-12; 20 C.F.R. §§ 404.981, 416.1481.

On October 8, 2004, plaintiff filed a complaint with this court seeking judicial review of the ALJ's

decision.[2] (Dkt. #1). He argues that decision should be reversed and remanded for an award of benefits for the following reasons:

(a) the ALJ improperly evaluated the medical evidence in the record;

(b) the ALJ erred in not finding plaintiff's gout to be severe at step two of the disability evaluation process;

(c) the ALJ failed to make a proper step three determination

(d) the ALJ did not provide legitimate reasons for rejecting plaintiff's credibility;

(e) the ALJ's assessment of plaintiff's residual functional capacity was inaccurate; and

(f) the ALJ erred in finding plaintiff capable of performing other jobs existing in significant numbers in the national economy.

For the reasons set forth below, the undersigned recommends the ALJ's decision be affirmed.

## DISCUSSION

This court must uphold the Commissioner's determination that plaintiff is not disabled if the Commissioner applied the proper legal standard and there is substantial evidence in the record as a whole to support the decision. Hoffman v. Heckler, 785 F.2d 1423, 1425 (9th Cir. 1986). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971); Fife v. Heckler, 767 F.2d 1427, 1429 (9th Cir. 1985). It is more than a scintilla but less than a preponderance. Sorenson v. Weinberger, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975); Carr v. Sullivan, 772 F. Supp. 522, 524-25 (E.D. Wash. 1991). If the evidence admits of more than one rational interpretation, the court must uphold the Commissioner's decision. Allen v. Heckler, 749 F.2d

---

[2]As indicated, plaintiff's complaint was filed more than three years after the Commissioner issued her final decision. A party may obtain judicial review of the Commissioner's final decision by commencing a civil action in federal court "within sixty days after the mailing to him of notice of such decision or within such further time as the Secretary may allow." 42 U.S.C. § 405(g); 20 C.F.R. §§ 404.981, 404.982, 416.1481, 416.1482. This "sixty-day time limit is not jurisdictional, but is instead a statute of limitation which the Secretary may waive." Banta v. Sullivan, 925 F.2d 343, 345 (9th Cir. 1991). As such, failure to file within the sixty-day time limit is an affirmative defense, which "is properly raised in a responsive pleading." Vernon v. Heckler, 811 F.2d 1274, 1278 (9th Cir. 1987) (citing Federal Rule of Civil Procedure 8(c)).

The court requested the parties address the issue of plaintiff's late filing of his complaint at oral argument, which was held on May 31, 2005. Plaintiff argues he never received notice of the Appeals Council's decision denying his request for review until January 2003, when plaintiff's counsel stated she first became aware of the denial, and requested that plaintiff's claim be re-opened and that he be granted an extension of time to file an appeal in federal court. Tr. 10; but see Vernon, 811 F.2d at 1277 (date of receipt of notice of Commissioner's final decision presumed to occur five days after date of notice) (citing 20 C.F.R. § 422.210(c)). Nevertheless, because the Commissioner failed to raise statute of limitations as an affirmative defense in her responsive pleading, the issue is waived, and the undersigned will deal with this matter on its merits.

REPORT AND RECOMMENDATION
Page - 3

1  577, 579 (9th Cir. 1984).

2  I.        Plaintiff's Date Last Insured

3  To be entitled to disability insurance benefits, plaintiff "must establish that [his] disability existed on
4  or before" the date his insured status expired. Tidwell v. Apfel, 161 F.3d 599, 601 (9th Cir. 1998); see also
5  Flaten v. Secretary of Health & Human Services, 44 F.3d 1453, 1460 (9th Cir. 1995) (social security
6  statutory scheme requires disability to be continuously disabling from time of onset during insured status to
7  time of application for benefits, if individual applies for benefits for current disability after expiration of
8  insured status). Plaintiff's date last insured was September 30, 1995. Tr. 26, 33, 47. Thus, he will not be
9  found disabled for purposes of determining whether he is entitled to disability insurance benefits, if he fails
10 to establish disability prior to or as of that date. Tidwell, 161 F.3d at 601.

11 II.       The ALJ Properly Evaluated the Medical Evidence in the Record

12 The ALJ is responsible for determining credibility and resolving ambiguities and conflicts in the
13 medical evidence. Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998). Where the medical evidence in the
14 record is not conclusive, "questions of credibility and resolution of conflicts" are solely the functions of the
15 ALJ. Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982). In such cases, therefore, "the ALJ's
16 conclusion must be upheld." Morgan v. Commissioner of the Social Security Administration, 169 F.3d 595,
17 601 (9th Cir. 1999). Determining whether inconsistencies in the medical evidence "are material (or are in
18 fact inconsistencies at all) and whether certain factors are relevant to discount" the opinions of medical
19 experts "falls within this responsibility." Id. at 603.

20 In resolving questions of credibility and conflicts in the evidence, an ALJ's findings "must be
21 supported by specific, cogent reasons." Reddick, 157 F.3d at 725. The ALJ can do this "by setting out a
22 detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation
23 thereof, and making findings." Id. The ALJ also may draw inferences "logically flowing from the evidence."
24 Sample, 694 F.2d at 642. Further, the court itself may draw "specific and legitimate inferences from the
25 ALJ's opinion." Magallanes v. Bowen, 881 F.2d 747, 755, (9th Cir. 1989).

26 The ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of
27 either a treating or examining physician. Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1996). Even when a
28 treating or examining physician's opinion is contradicted, that opinion "can only be rejected for specific and

REPORT AND RECOMMENDATION
Page - 4

1  legitimate reasons that are supported by substantial evidence in the record." Id. at 830-31.  However, the

2  ALJ "need not discuss *all* evidence presented" to him or her. Vincent on Behalf of Vincent v. Heckler, 739

3  F.3d 1393, 1394-95 (9th Cir. 1984) (citation omitted) (emphasis in the original).  The ALJ must only explain

4  why "significant probative evidence has been rejected." Id.; see also Cotter v. Harris, 642 F.2d 700, 706-07

5  (3d Cir. 1981); Garfield v. Schweiker, 732 F.2d 605, 610 (7th Cir. 1984).

6       In general, more weight is given to a treating physician's opinion than to the opinions of those who

7  do not treat the claimant. Lester, 81 F.3d at 830.  On the other hand, an ALJ need not accept the opinion of

8  a treating physician, "if that opinion is brief, conclusory, and inadequately supported by clinical findings."

9  Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002); Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th

10  Cir. 2001); Magallanes, 881 F.2d at 75.  An examining physician's opinion is "entitled to greater weight

11  than the opinion of a nonexamining physician." Lester, 81 F.3d at 830-31.  A nonexamining physician's

12  opinion may constitute substantial evidence if "it is consistent with other independent evidence in the

13  record." Id. at 830-31; Tonapetyan, 242 F.3d at 1149.

14      A.   Dr. Rubenstein's Opinions

15       Plaintiff argues the ALJ erred in evaluating the opinions of Dr. Robert S. Rubenstein, his treating

16  neurologist. With respect to those opinions, the ALJ found in relevant part as follows:

> Dr. Rubenstein has opined in a succession of general assistance evaluations that the claimant is unable to work due solely to the condition of his neck and lower back. However, Dr. Rubenstein inconsistently disclosed in the same evaluations that despite the claimant[']s medical condition, which has remained stable for the past seven years, he can perform at least sedentary work functions, lifting up to 10 pounds, sitting, and performing a certain amount of standing and walking. . . . The claimant[']s other treating and examining providers have opined pursuant to a multitude of general assistance examinations that the claimant[']s overall condition has remained unchanged, and that he can perform work at sedentary to light levels. . . . Similarly, the state Disability Determination Service (DDS) medical consultants and consultative physician opined, and the medical expert testified at the hearing, that the claimant can perform sedentary to light work.

Tr. 30-31.  The undersigned finds this determination to be proper.

     Plaintiff first claims the ALJ erred in finding Dr. Rubenstein's evaluations internally inconsistent.  He asserts that in addition to indicating in general the maximum exertional level a claimant is capable of reaching, the state physical evaluation forms Dr. Rubenstein used also provide the opportunity to set forth additional limitations specific to the particular claimant.  Plaintiff states this is how Dr. Rubenstein used those forms, and argues the court should interpret them in this way.  The undersigned disagrees.

REPORT AND RECOMMENDATION
Page - 5

1    While one could read the state evaluation forms in the manner plaintiff proposes, the format and language of those forms make their meaning ambiguous. For example, in late July 1993, Dr. Rubenstein completed such a form, in which he stated plaintiff could perform sedentary work at least half-time in a normal day-to-day work setting. Tr. 241. Yet he stated elsewhere on that form that plaintiff was markedly impaired (i.e., a "[v]ery significant interference with the ability to perform one or more basic work-related activities") due to lumbar disc disease, and that he would be so impaired for at least six months to five years. Tr. 239, 242. Indeed, it is not even clear from that form whether having a marked impairment and still being able to perform sedentary work are incompatible.

In late December 1998, Dr. Rubenstein completed another state physical evaluation form, in which he again stated that plaintiff could perform sedentary work at least half-time in a normal day-to-day work setting. Tr. 323. He also indicated that plaintiff's symptoms were "stable." Id. Once more, however, Dr. Rubenstein stated elsewhere on that form (this time on the bottom of the same page) that plaintiff would be unable to perform at least half-time in a normal day-to-day work setting for fifty-three weeks, and that treatment was not likely to restore his ability to do so. Id.

In other words, it is not clear how these state evaluation forms are intended to be interpreted, and no explanation has been provided on those forms as to how they should be read. Because it is the ALJ's sole responsibility to resolve conflicts and ambiguities in the medical evidence, the court cannot fault the ALJ for finding the opinions of Dr. Rubenstein contained in those forms to be inconsistent. Reddick, 157 F.3d at 722; Sample, 694 F.2d at 642. In any event, as discussed below, the substantial evidence in the record does not support a finding that plaintiff is unable to perform less than half-time work or at less than the sedentary exertional level.

Indeed, many of Dr. Rubenstein's own diagnostic notes and other reports indicate plaintiff is not disabled. In early October 1991, Dr. Rubenstein found plaintiff's examination to be "significant for full cervical range of motion without increased" tenderness. Tr. 272. Plaintiff had a mild decrease in his right upper extremity strength. Id. He also had increased spastic tone in his lower extremities, although he had full strength with no evidence of muscle atrophy. Id. In addition, other than some decrease in sensation in his right thigh, his sensation was normal. Id. Gait and coordination were normal as well, except for "right leg radicular symptoms" induced by heel walking. Id.

REPORT AND RECOMMENDATION
Page - 6

1    In early November 1991, plaintiff told Dr. Rubenstein that ibuprofen and nortiptyline helped to
2 decrease his back pain and symptoms, and he reported both less persistent and less radicular pain. Tr. 273.
3 He also denied "persistent" right leg weakness or numbness and gait dysfunction. Id.  Again, "significant
4 aspects" of his examination were "normal strength and sensation in the lower extremities." Id.
5    Plaintiff reported "[n]o significant leg symptoms" in early January 1992, although on examination,
6 he did have some decreased sensation in his right thigh, decreased toe walking on the right, and diminished
7 right ankle deep tendon reflexes. Tr. 270.  On the other hand, he had full upper extremity strength. Id.  Dr.
8 Rubenstein also noted plaintiff had "[s]ubjective complaints" of right spinal weakness, but "with minimal
9 objective confirmation." Id.  Electrodiagnostic testing performed later that month "revealed no denervation
10 in the right limb muscles." Id.
11    Plaintiff reported in late January 1992, being able to perform "all of his daily activity functions,"
12 aside from those that required prolonged sitting or standing due to pain in his low back and gluteal region.
13 Id.  Electrodiagnostic testing "revealed no signs of denervation in the right limb muscles," and plaintiff was
14 found to be "symptomatically stable" Id.
15    In early March 1992, Dr. Rubenstein opined that plaintiff was capable of performing sedentary work,
16 with certain moderate postural restrictions. Tr. 225.  In mid-May 1992, plaintiff reported having "[no]
17 recurrence of significant neck pain," and denied any "leg weakness, persistent numbness or gait
18 dysfunction." Tr. 269.  He also reported getting "moderate relief" from ibuprofen. Id.  While straight leg
19 raising produced radiating pain in his back, plaintiff had normal lower extremity strength, sensation and gait,
20 with no weakness or sensory loss. Id.
21    In mid-September 1992, Dr. Rubenstein found plaintiff to have full cervical range of motion. Tr.
22 268.  While plaintiff had some pain and tenderness in his lumber spine and the base of his buttocks and
23 decreased deep tendon reflexes in his right ankle, he had full strength in his right arm and leg "without
24 radicular sensory loss," arm weakness or persistent numbness. Id.  Dr. Rubenstein further noted that none of
25 plaintiff's problems were causing "any lasting neurologic deficit." Id.  Thus, he continued to treat him
26 conservatively. Id.
27    Plaintiff reported "[c]omplete relief of cervical right arm symptoms with increased Elavil" in early
28 November 1992. Id.  Although his right lower back and leg pain continued, its severity also had decreased.

REPORT AND RECOMMENDATION
Page - 7

Id. Plaintiff had "[n]o gait dysfunction" or "other new neurologic complaints," and his strength was "full throughout," with only mild decreased sensation in his right thigh. Id. Again, Dr. Rubenstein decided to "continue conservative management," due to plaintiff's "neurologic status" remaining stable. Id.

In late July 1993, plaintiff reported still having "no difficulties with gait." Tr. 267. While he had decreased right thigh sensation, his strength was full. Id. Dr. Rubenstein found his neurologic examination and symptoms had remained stable. Id. As noted above, Dr. Rubenstein deemed plaintiff to be capable of performing sedentary work, and indicated he would continue to follow him conservatively, unless at some point surgery became necessary. Tr. 241.

In early January 1997, Dr. Rubenstein noted that while plaintiff was still limited by symptoms of lower lumbosacral radiculopathy and cervical myelopathy, he had "remained symptomatically stable." Tr. 280. Further, plaintiff had "pain control with anti-inflammatory medications." Id. On examination, he had full cervical range of motion, with "nonradiating" neck pain. Id. While he did have some motor weakness in his right toes, decreased sensation in his fingers and right thigh, and diminished deep tendon reflexes in his right biceps and ankle, his gait and coordination were intact. Tr. 280-81. Dr. Rubenstein also assessed plaintiff with an "unchanged neurologic examination over the past six years," and suggested "continued conservative care" unless his symptoms worsened. Tr. 281.

Dr. Rubenstein completed another state physical evaluation form at that time as well. He stated that plaintiff could perform sedentary work, although he was limited by decreased lumbar flexion and lateral tilt. Tr. 279. Dr. Rubenstein also appears to have answered "0" to the question of how long he estimated plaintiff would be unable to perform at least half-time in a day-to-day work setting. Id. In addition, while Dr. Rubenstein answered "no" to the question of whether treatment was likely to restore plaintiff's ability to perform at least half time in a day-to-day work setting, he also wrote "surgery not recommended unless condition deteriorates." Id.

B.    Other Medical Opinions

Plaintiff next argues the ALJ erred in finding the other medical sources in the record contradicts the opinions of Dr. Rubenstein. Plaintiff first asserts that many of the opinions cited by the ALJ pre-date his amended alleged onset date of disability. While this may be true, it also should be noted that Dr. Rubenstein's December 1998 evaluation (upon which plaintiff appears to rely in support of his allegation of

Case 3:04-cv-05676-FDB   Document 18   Filed 07/05/05   Page 9 of 20

disability) actually post-dates plaintiff's date last insured by more than three years. Therefore, the relevance of that evaluation is questionable as well, at least with respect to plaintiff's claim for disability insurance benefits. In any event, those opinions which pre-date plaintiff's amended alleged onset date of disability do shed light on his on-going condition. In addition, the majority of the medical opinions in the record, including those provided after September 1, 1995, do indicate plaintiff is capable of performing at a level greater than that indicative of disability.

For example, Dr. William Ferman examined plaintiff in early March 1990, finding "[n]o physical limitation." Tr. 183. In early August 1991, Dr. Robert B. Bright, another of plaintiff's treating physicians, found "[n]o major neuromuscular deficiencies," and limited plaintiff to light work with certain moderate postural limitations. Tr. 195-96. He provided essentially the same opinion in late October 1991. Tr. 198, 200. A residual functional capacity assessment form completed by a non-examining consulting physician in early August 1992, indicated that plaintiff was capable of doing light work, again with certain moderate postural limitations. Tr. 228-31.

In early March 1993, Dr. Bright again opined that plaintiff had "[n]o major muscular deficiencies" and could perform light work with moderate postural limitations. Tr. 235, 237. A state physical evaluation form was completed by Dr. R. S. Case in mid-December 1994. He deemed plaintiff capable of performing sedentary work, with indications of limitation on agility, mobility or flexibility. Tr. 245. He estimated the length of time plaintiff would be unable to perform at least half-time in a day-to-day work setting was only three months. Id. He also recommended plaintiff participate in vocational rehabilitation. Id.

In early March 1995, Dr. Case completed another physical evaluation form, in which he provided basically the same opinion he did in mid-December 1994, the only difference this time being that plaintiff would be limited to the extent indicated for only six months. Tr. 246-47. Dr. James D. Livermore, another treating physician, examined plaintiff in late March 1995. That examination revealed full neck range of motion "with minimal discomfort," and full range of motion in plaintiff's upper extremities. Tr. 250. He also had full motor strength and normal sensation. Id. While plaintiff exhibited "mild tenderness to palpation," he had no pain with hip range of motion, and straight leg raising was largely negative, limited only by "hamstring tightness." Id. Thus, Dr. Livermore found "[n]o hard evidence of radiculopathy," and recommended essentially conservative treatment. Id.

REPORT AND RECOMMENDATION
Page - 9

Plaintiff saw Dr. Livermore in early May 1995 for left elbow discomfort. Dr. Livermore found "[n]o areas of point tenderness," and full motor strength about the elbow. Tr. 251. X-rays of the elbow were normal as well. Id. While plaintiff lacked full elbow extension, there was "no evidence of mechanical abnormality." Id. An electrodiagnostic study of plaintiff's lumbar spine also revealed a small bulge, which did "not appear to significantly compromise the nerve root." Id.

In early August 1995, less than one month prior to plaintiff's alleged onset date of disability, Dr. Livermore informed plaintiff that "while he was certainly not capable of heavy physical labor based upon his current problems . . . he was capable of sedentary endeavors not requiring prolonged standing, sitting, or walking . . . [or] heavy lifting." Id. In mid-August 1995, Dr. Livermore completed a state physical evaluation form, in which he again stated plaintiff was capable of performing sedentary work. Tr. 265. He further stated plaintiff had no indications of limitation on agility, mobility or flexibility. Id.

Dr. Livermore examined plaintiff again in late February 1996. He noted that aside from using ibuprofen occasionally, plaintiff was not taking any other medications. Tr. 252. On examination, plaintiff had full range of motion in his cervical spine and upper extremities. Id. While he had some "subjectively diminished sensation" in his cervical spine, the remainder of his sensation was normal. Id. Plaintiff's motor strength also was normal, and his straight leg raising was limited only by hamstring tightness. Id. Thus, Dr. Livermore found "[n]o evidence of hard radiculopathy," stating that his symptoms were "well maintained on minimal conservative medication," and that his "status regarding work" (i.e., that he was capable of performing sedentary work) had "not changed." Tr. 252, 257.

In early June 1997, Dr. Rafique Kassim found plaintiff able to sit and stand from a sitting position, walk on his heels and toes, and squat and rise from a squatting position. Tr. 292. Plaintiff could use his hands for grasping and manipulating, perform fine and dexterous movements, dress and undress himself, and climb up on the examining table. Id. While his knee jerks were "somewhat hyperreflexic," his ankle jerk on the right was absent, and he had positive straight leg raising also on the right, his muscle tone, strength, sensation, and coordination were all normal, and he exhibited no spasticity, rigidity, involuntary movement, tremors, or atrophy. Tr. 292-93. He did have "some decreased" lumbar spine range of motion in flexion, but his lateral motion and extension were normal. Tr. 293.

Dr. Kassim diagnosed plaintiff with "some degenerative disk disease in his lumbar spine," as well as

1  "some degree of sciatica and radiculopathy." Id.  With respect to plaintiff's chronic low back pain, Dr.
2  Kassim recommended he lose weight and do physical therapy or be put on a home exercise program. Id.  In
3  terms of his ability to work, Dr. Kassim felt "he would not, at this time, be able to work in the boiler room
4  or do any physically strenuous work." Id.  However, he believed plaintiff capable of doing "some sedentary
5  or light physical work if he were allowed to vary his position from time to time." Id.  Plaintiff himself
6  expressed an interest in vocational rehabilitation "to see if he could be retrained in another, less physically
7  strenuous occupation," which Dr. Kassim thought would be "a good idea." Id.

8  During an emergency room visit in late June 1997, Dr. Bernard M. Greenfeld noted that plaintiff had
9  done "a lot of walking" the day before. Tr. 297.  Plaintiff appeared comfortable, and, while he did have
10 some left foot pain, his hips, knees, ankles, and achilles tendon were nontender." Id.  X-rays of plaintiff's left
11 foot were largely normal, and he was assessed with a questionable left foot stress fracture, and doubtful
12 gout. Tr. 297-98.  A residual physical functional capacity assessment form completed by a non-examining
13 consulting physician in early July 1997, limited plaintiff to essentially light work, with moderate postural
14 limitations. Tr. 301-04.  Another such form completed by a different non-examining consulting physician in
15 early December 1997, produced substantially similar findings. Tr. 284-87.

16 III.    The ALJ Conducted a Proper Step Two Analysis

17 To determine whether a claimant is entitled to disability benefits, the ALJ engages in a five-step
18 sequential evaluation process. 20 C.F.R. § 404.1520.  At step two of this process, the ALJ must determine if
19 an impairment is "severe". Id.  An impairment is "not severe" if it does not "significantly limit" a claimant's
20 mental or physical abilities to do basic work activities. 20 C.F.R. §§ 404.1520(c), 404.1521(a); Social
21 Security Ruling ("SSR") 96-3p.  Basic work activities consist of those "abilities and aptitudes necessary to
22 do most jobs." 20 C.F.R. § 140.1521(b); SSR 85- 28; SSR 96-3p.

23 An impairment is not severe only if the evidence establishes a slight abnormality that has "no more
24 than a minimal effect on an individual[']s ability to work." See SSR  85-28; Smolen v. Chater, 80 F.3d
25 1273, 1290 (9th Cir. 1996); Yuckert v. Bowen, 841 F.2d 303, 306 (9th Cir.1988).  Plaintiff has the burden of
26 proving that her "impairments or their symptoms affect his ability to perform basic work activities." Edlund
27 v. Massanari, 253 F.3d 1152, 1159-60 (9th Cir. 2001); Tidwell v. Apfel, 161 F.3d 599, 601 (9th Cir. 1998).
28 Plaintiff will not be found disabled if he fails "to establish [he] had a severe impairment" on or before his

REPORT AND RECOMMENDATION
Page - 11

1  date last insured. Tidwell, 161 F.3d at 601.

2  Plaintiff argues the ALJ erred by failing to mention in his decision that he had gout. To the extent
3  that such failure constitutes error, that error is harmless. See Batson v. Commissioner of the Social Security
4  Administration, 359 F.3d 1190, 1197 (9th Cir. 2004) (applying harmless error standard); Curry v. Sullivan,
5  925 F.2d 1127, 1131 (9th Cir. 1990) (holding ALJ committed harmless error). At step two, the ALJ found
6  plaintiff had a severe impairment consisting of degenerative disc disease. Tr. 27. A review of the medical
7  evidence in the record does not indicate plaintiff's gout constitutes a severe impairment. Indeed, it is not
8  even clear that plaintiff has received a definitive diagnosis of gout.

9  In late June 1997, plaintiff saw Dr. Greenfeld for a complaint of left foot pain. Plaintiff reported
10 having "no history of gout." Tr. 297. While he had some joint pain in his left great toe, there was no
11 swelling, redness or "particular pain with palpation." Id. The toenail was normal, and Dr. Greenfeld felt that
12 it did "not look like a gouty toe." Id. Again, although Dr. Greenfeld stated it was "possible" plaintiff had
13 gout, his great toe was "not particularly red or swollen." Id. As there was "[n]o clear evidence of gouty
14 arthritis" seen on x-rays, Dr. Greenfeld in the end doubted plaintiff had gout. Tr. 297-98.

15 Plaintiff was seen by Dr. Nancy M. Shasteen for a rheumatology consultation in late September
16 1997. Plaintiff reported that his left elbow "becomes swollen, painful, [and] lasts about a week," although
17 he had not noticed "any particular erythema over the joint." Tr. 317. He also reported that he got these
18 episodes "about three to four times a year, maybe five times a year," and that he recently had "developed a
19 similar episode" involving his left foot. Id. Nevertheless, Dr. Shasteen found that all of plaintiff's joints were
20 currently "quiet." Id. His elbows had no synovitis, effusion or erythema, and he had "good range of
21 motion" in his joints. Tr. 318. She diagnosed him with "episodic joint pain and swelling," which she felt
22 could be gout, although another possibility was palindromic rheumatism. Id.

23 In terms of work-related functional limitations, there is no indication in the medical evidence that
24 plaintiff has had any significant lasting ones due to gout. In addition to the medical evidence discussed
25 above, plaintiff told a physician's assistant in late July 1997, that his episodes of elbow pain had occurred
26 only "twice in the past about two years ago." Tr. 313. In late August 1997, he also reported that while he
27 was having difficulty with extension due to recurrent left elbow pain, that pain was "slowly improving" on
28 ibuprofen. Tr. 311. It was further noted that he was not taking any medication specifically prescribed for

1  gout. Id. Although the physician's assistant diagnosed plaintiff with gout in his left elbow, it was noted in
2  late September 1997, that his gout was "quiet." Tr. 285, 311, 317.
3  IV.     The ALJ's Step Three Determination Was Legally Adequate
4         At step three of the disability evaluation process, the ALJ must evaluate the claimant's impairments
5  to see if they meet or equal any of the impairments listed in 20 C.F. R. Pt. 404, Subpt. P, App. 1. 20 C.F.R
6  (the "Listings"). § 416.920(d); Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999). If any of the
7  claimant's impairments meet or equal a listed impairment, the claimant is deemed disabled. Id. The burden
8  of proof is on the claimant to establish he meets or equals any of the impairments in the listings. Tacket, 180
9  F.3d at 1098.
10        A mental or physical impairment "must result from anatomical, physiological, or psychological
11 abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques." 20
12 C.F.R. § 416.908. It must be established by medical evidence "consisting of signs, symptoms, and
13 laboratory findings." Id. Further, an impairment meets a listed impairment "only when it manifests the
14 specific findings described in the set of medical criteria for that listed impairment." SSR 83-19.
15        At step three, the ALJ found as follows:

> The evidence supports a finding that the claimant has degenerative disc disease, which alone constitutes a severe impairment. . . . However, neither the medical expert nor any provider of record has observed clinical findings meeting, or equivalent in severity to, the criteria of any of the listed impairments described in [20 C.F. R. Pt. 404, Subpt. P, App. 1].

19 Tr. 27. Plaintiff argues he meets Listing 1.04, because there is medical evidence of a neurological deficit in
20 the record. Plaintiff's argument, however, is based on a fundamental misunderstanding of the requirements
21 of Listing 1.04. That specific Listing reads in relevant part as follows:

> Disorders of the spine (e.g., . . . degenerative disc disease . . .), resulting in compromise of a nerve root . . . or the spinal cord. With:
>
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

26 20 C.F. R. Pt. 404, Subpt. P, App. 1, § 1.04.
27        In addition to evidence of a neurological deficit as described above, the Listing 1.04 also requires
28 that such deficit result in a "loss of function." 20 C.F. R. Pt. 404, Subpt. P, App. 1, § 1.00B.1. The phrase

REPORT AND RECOMMENDATION
Page - 13

"loss of function" is defined as follows:

> [T]he inability to ambulate effectively on a sustained basis for any reason, including pain associated with the underlying musculoskeletal impairment, or the inability to perform fine and gross movements effectively on a sustained basis for any reason, including pain associated with the underlying musculoskeletal impairment. The inability to ambulate effectively or the inability to perform fine and gross movements effectively must have lasted, or be expected to last, for at least 12 months.

20 C.F. R. Pt. 404, Subpt. P, App. 1, § 1.00B.2.a. The phrase "inability to ambulate effectively" means:

> [A]n extreme limitation on the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning . . . to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities.

20 C.F. R. Pt. 404, Subpt. P, App. 1, § 1.00B.2.b. The phrase "inability to perform fine gross movements" in turn is defined in relevant part as follows:

> [A]n extreme loss of function of both upper extremities; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities.

20 C.F. R. Pt. 404, Subpt. P, App. 1, § 1.00B.2.c.

It is true there is some medical evidence in the record that plaintiff has been diagnosed with one or more neurological deficits. Tr. 213, 216, 251, 268-73, 277, 280-81, 293, 393-94. On the other hand, the medical evidence in the record also tends to show that his neuormuscular deficences are not of a disabling nature. Tr. 183-84, 195, 198, 235, 250-52, 267-70, 273, 275, 280-81, 292-93, 393-94. In any event, there is no medical evidence in the record that shows any such deficit has resulted in a "loss of function" as that phrase is defined in the Listings. That is, no medical source in the record has opined that plaintiff has been unable to ambulate effectively or unable to perform fine and gross movements effectively for at least twelve months. Indeed, Dr. Kassim noted in early June 1997, that plaintiff was "able to use his hands for grasping and manipulating and to perform fine and dexterous movements," and that he was able to walk on his heels and toes and perform other movements without any problems. Tr. 292.

V.   The ALJ Properly Assessed Plaintiff's Credibility

Questions of credibility are solely within the control of the ALJ. Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982). The court should not "second-guess" this credibility determination. Allen, 749 F.2d at 580. In addition, the court may not reverse a credibility determination where that determination is based on contradictory or ambiguous evidence. Id. at 579. That some of the reasons for discrediting a

REPORT AND RECOMMENDATION
Page - 14

claimant's testimony should properly be discounted does not render the ALJ's determination invalid, as long as that determination is supported by substantial evidence. Tonapetyan, 242 F.3d at 1148.

To reject a claimant's subjective complaints, the ALJ must provide "specific, cogent reasons for the disbelief." Lester, 81 F.3d at 834 (citation omitted). The ALJ "must identify what testimony is not credible and what evidence undermines the claimant's complaints." Lester, 81 F.3d at 834; Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993). Unless affirmative evidence shows the claimant is malingering, the ALJ's reasons for rejecting the claimant's testimony must be "clear and convincing." Lester, 81 F.2d at 834. The evidence as a whole must support a finding of malingering. O'Donnell v. Barnhart, 318 F.3d 811, 818 (8th Cir. 2003).

In determining a claimant's credibility, the ALJ may consider "ordinary techniques of credibility evaluation," such as reputation for lying, prior inconsistent statements concerning symptoms, and other testimony that "appears less than candid." Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996). The ALJ also may consider a claimant's work record and observations of physicians and other third parties regarding the nature, onset, duration, and frequency of symptoms. Id.

The ALJ discounted plaintiff's credibility in part because his allegations of disabling symptoms and pain were not consistent with the medical evidence in the record. Tr. 29-31. Specifically, for example, the ALJ noted as follows:

> The claimant has described that the pain he experiences throughout his body, especially in his lower back, hips and right leg, is constant, incapacitating, and now requires him to use a cane to walk. . . . However, his treating neurologist, Dr. Rubenstein, opined in December, 1998, that the claimant[']s condition has remained stable for over the past seven years, and has required only periodic, conservative treatment. . . . His physicians have prescribed only an elastic support for his lower back, and have observed no abnormalities in his gait, station or coordination. They have prescribed no cane or other assistive device for his use. . . . The claimant walked without a cane when he appeared at the hearing in this matter.

Tr. 29-30. A finding that a claimant's symptom complaints are "inconsistent with clinical observations" can satisfy the clear and convincing requirement. Regennitter v. Commissioner of SSA, 166 F.3d 1294, 1297 (9th Cir. 1998). As discussed above, the ALJ did not err in evaluating the medical evidence in the record, and rejecting the suggestion that plaintiff was unable to work at least half-time or unable to perform at least sedentary work. Also as discussed above, the medical evidence in the record indicates that plaintiff has no significant ambulatory restrictions.

REPORT AND RECOMMENDATION
Page - 15

In addition, the ALJ may rely on a claimant's demeanor at the hearing as a basis for discrediting his testimony. Thomas v. Barnhart, 278 F.3d 947, 960 (9th Cir. 2002); Matney v. Sullivan, 981 F.2d 1016, 1020 (9th Cir. 1992). Inclusion of personal observations of the claimant in the ALJ's findings "does not render the decision improper." Nyman v. Heckler, 779 F.2d 528, 531 (9th Cir. 1986). The ALJ, however, may not reject a claimant's subjective complaints "solely on the basis of" personal observations. SSR 95-5p. Thus, the ALJ did not err in discounting plaintiff's credibility for the reasons set forth above.

The ALJ also discounted plaintiff's credibility in part because of his activities of daily living:

> Although the claimant reported to the Social Security Administration that due to his medical condition he has difficulty handling self care tasks or typical household chores and cannot walk very far . . . he disclosed to the providers of record that he is, in fact, capable of doing a lot of walking, and can walk from his home to his medical appointments. . . . [H]is descriptions of his daily activities disclose that he has required no particular assistance and can independently shop for groceries and other items, prepare his own meals, maintain his household, and handle his bills.

Tr. 30. To determine whether a claimant's symptom testimony is credible, the ALJ may consider his or her daily activities. Smolen, 80 F.3d at 1284. Such testimony may be rejected if the claimant "is able to spend a substantial part of his or her day performing household chores or other activities that are transferable to a work setting." Id. at 1284 n.7. The claimant need not be "utterly incapacitated" to be eligible for disability benefits, and "many home activities may not be easily transferable to a work environment." Id.

The evidence in the record supports the ALJ's findings on this issue. For example, Dr. Rubenstein stated in late January 1992, that aside from activities that require prolonged sitting or standing, plaintiff otherwise was "able to perform all of his daily activities." Tr. 270. In late June 1997, Dr. Greenfield noted that plaintiff had done "a lot of walking" the day before. Tr. 297. Plaintiff's descriptions of his activities of daily living, furthermore, indicate he is far from disabled, although, as he states, he may do those activities at a slower pace now than he did before. Tr. 92-96.

The ALJ next discounted plaintiff's credibility for the following reason:

> The claimant reported to the Administration, as well as to some of his physicians, that he drank alcohol heavily in the remote past but for the past several years has drunk very little, or has abstained altogether. . . . In contrast, the substantial evidence of record discloses that the claimant has described himself as an alcoholic or recovering alcoholic. He has appeared intoxicated for some of his medical examinations, and has continued to drink up to a six pack of beer per day as recently as September, 1997.

Tr. 30. Plaintiff argues that the ALJ's discussion of plaintiff's history of alcohol abuse was improper, as he was not drinking at the time of the hearing, and because the ALJ did not conduct a drug and alcohol abuse

1  analysis to see if his drinking was material to his disability. Plaintiff also asserts that his alcoholism should
2  not be used simply to impugn his credibility.

3        This, however, is not what the ALJ did. Rather, the ALJ used plaintiff's inconsistent statements
4  regarding his use of alcohol in the recent past to discount his credibility, which is proper. See Smolen, 80
5  F.3d at 1284 (ALJ may consider prior inconsistent statements and other testimony that appears less than
6  candid). For example, plaintiff told Dr. Kassim in early June 1997, that he had not used alcohol since 1987,
7  when he went through rehabilitation. Tr. 292. In late July 1997, however, he reported that he had "not
8  drank heavily in about five years," and that he still drank "occasionally, maybe two or three times a year."
9  Tr. 313. In late September 1997, furthermore, plaintiff told Dr. Shasteen that he drank "about a six pack of
10  beer a day" several times per week. Tr. 318.

11        Finally, the ALJ discounted plaintiff's credibility for failure to seek treatment:

> The claimant testified that, at present, he sees Dr. Rubenstein about once per year, and otherwise gets treatment as needed form a physician[']s assistant at a local clinic. He sees no medical specialist on a regular basis. As discussed above, his condition has remained stable with nothing more than conservative treatment and brief, sporadic courses of physical therapy. Moreover, the claimant has generally used only Ibuprofen, i.e., over the counter intiinflammatory preparations, for his pain. . . . Such is not the type of treatment one would expect for a totally disabled individual.

16  Tr. 31. Failure to assert a good reason for not seeking, or following a prescribed course of, treatment, or a
17  finding that a proffered reason is not believable, "can cast doubt on the sincerity of the claimant's pain
18  testimony." Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989). On the other hand, if the claimant provides
19  evidence of a good reason for not taking medication, his symptom testimony cannot be rejected because he
20  failed to do so. Smolen, 80 F.3d at 1284.

21        Plaintiff argues that this reason for discounting his credibility is improper, because the ALJ failed to
22  note that he chose to structure his activities so as to minimize his symptoms in lieu of pursuing ongoing
23  medical treatment or prescription medications. One cannot fault the ALJ, however, for viewing the dearth
24  of evidence in the record concerning more aggressive medical treatment as indicating plaintiff had a less than
25  disabling condition. It is true that SSR 96-7p directs administrative adjudicator's to consider other
26  explanations a claimant may have for not seeking greater medical treatment, as does the above cited case
27  law. The reason plaintiff asserts for not seeking such treatment might be more plausible if the record
28  contained some evidence that his physicians recommended he obtain greater medical treatment, but could

REPORT AND RECOMMENDATION
Page - 17

not or did not want to do so due to cost or other factors such as medication side effects. See Smolen, 80 F.3d at 1184; SSR 96-7p. The medical evidence in the record simply does not contain such evidence. See Tr. 219, 250-52, 267-71, 273, 279, 281, 293, 318, 395.

VI. The ALJ Did Not Err in Assessing Plaintiff's Residual Functional Capacity

If a disability determination "cannot be made on the basis of medical factors alone," the ALJ must identify the claimant's "functional limitations and restrictions" and assess his or her "remaining capacities for work-related activities." SSR 96-8p. A claimant's residual functional capacity assessment is used at step four to determine whether he or she can do his or her past relevant work, and at step five to determine whether he or she can do other work. Id. at *2. The residual functional capacity assessment thus is what the claimant "can still do despite his or her limitations." Id.

A claimant's residual functional capacity is the maximum amount of work the claimant is able to perform based on all of the relevant evidence in the record. Id. However, a claimant's inability to work must result from his or her "physical or mental impairment(s)." Id. The ALJ, therefore, must consider only those limitations and restrictions "attributable to medically determinable impairments." Id. In assessing a claimant's residual functional capacity, the ALJ also is required to discuss why the claimant's "symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical or other evidence." Id. at *7.

The ALJ assessed plaintiff with the following residual functional capacity:

> [Plaintiff] has the residual functional capacity to perform light work, with maximum lifting of 20 pounds and frequent lifting of 10 pounds. . . . This capacity for light work is somewhat, but not significantly, eroded in that the claimant can stand and walk for 4-5 hours within an eight hour work day, but should avoid repetitive bending, stooping[,] squatting or climbing. He has the option to alternate between sitting and standing positions every hour.

Tr. 31. Plaintiff argues the ALJ's statement that his capacity for light work is not significantly limited is inconsistent with the ALJ's other statement that he should avoid bending and stooping. This argument is wholly without merit. Regardless of the choice of words used by the ALJ to describe how much plaintiff's capacity for light work has been modified by other additional functional limitations, he did find plaintiff should avoid repetitive bending and stooping. This finding is well supported by the evidence in the record, which indicates moderate limitations in these areas. Tr. 196, 200, 225, 229, 237, 241, 285, 302.

Plaintiff further argues the ALJ's assessment of his residual functional capacity erroneously omits

REPORT AND RECOMMENDATION
Page - 18

several other limitations: manipulative limitations due to right thumb and forefinger numbness; a limitation to less than sedentary work; limitations on sitting; and the need to alternate sitting and reclining. As to the limitation to less than sedentary work, as discussed above, the evidence in the record does not support such a restriction. In addition, the evidence in the record does not support a limitation on fingering or handling. While Dr. Rubenstein noted that plaintiff did have some finger numbness, he did not find plaintiff suffered from any limitations resulting therefrom. Tr. 280-81. Further, although one non-examining physician did find plaintiff limited in his ability to feel on the right, Dr. Kassim found he had no problems with grasping, manipulating or performing fine and dextrous movements. Tr. 292.

Plaintiff does not state specifically what sitting limitations should have been included in the ALJ's assessment of his residual functional capacity, but the ALJ's sit/stand option appears to cover those sitting limitations that are supported by the record. Finally, other than plaintiff's testimony regarding his alleged need to recline periodically, none of the medical sources in the record indicated that he would need to do so. Plaintiff states that Dr. Scott Van Linder, the medical expert, testified that his need to lie down on the floor was "a personal choice in the matter of tolerance." Tr. 393. That is precisely the point. In the very next sentence, Dr. Linder went on to testify that this need was "not really a medical finding as such." Id. Thus, because, as discussed above, the ALJ properly discounted plaintiff's credibility regarding his pain and symptom testimony, he was not required to include this limitation.

VII. The ALJ Properly Found Plaintiff Not Disabled at Step Five of the Disability Evaluation Process

If a claimant cannot perform his or her past relevant work, at step five of the disability evaluation process the ALJ must show there are a significant number of jobs in the national economy the claimant is able to do. Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. § 416.920(d), (e). The ALJ can do this through the testimony of a vocational expert or by reference to the Commissioner's Medical-Vocational Guidelines (the "Grids"). Tackett, 180 F.3d at 1100-1101; Osenbrock v. Apfel, 240 F.3d 1157, 1162 (9th Cir. 2000).

An ALJ's findings will be upheld if the weight of the medical evidence supports the hypothetical posed by the ALJ. Martinez v. Heckler, 807 F.2d 771, 774 (9th Cir. 1987); Gallant v. Heckler, 753 F.2d 1450, 1456 (9th Cir. 1984). The vocational expert's testimony therefore must be reliable in light of the medical evidence to qualify as substantial evidence. Embrey v. Bowen, 849 F.2d 418, 422 (9th Cir. 1988).

1 Accordingly, the ALJ's description of the claimant's disability "must be accurate, detailed, and supported by
2 the medical record." <u>Embrey</u>, 849 F.2d at 422 (citations omitted).  The ALJ, however, may omit from that
3 description those limitations he finds do not exist. <u>Rollins v. Massanari</u>, 261 F.3d 853, 857 (9th Cir. 2001)
4 (because ALJ included all limitations that he found to exist, and those findings were supported by substantial
5 evidence, ALJ did not err in omitting other limitations claimant failed to prove).
6       The ALJ posed the following hypothetical question to the ALJ:
7 Let's assume we have a person who's 43 to 47 years of age with a GED, past work experience semiskilled to skilled.  We have a person with a similar age, education, and
8 work experience as that of the Claimant.  This person can lift 20 pounds occasionally, 10 pounds frequently, can stand and walk four to five hours out of an eight-hour day, no
9 repetitive bending, stooping, squatting, climbing, and a sit/stand option every hour.
10 Tr. 396.  Plaintiff argues the ALJ erred in not including the sitting and handling limitations he argued for
11 inclusion in the ALJ's residual functional capacity discussed above.  For the same reasons the ALJ did not
12 err in excluding those limitations from his assessment of plaintiff's residual functional capacity, he also did
13 not err from excluding them from the above hypothetical question.
14 CONCLUSION
15       Based on the foregoing discussion, the Court should find the ALJ properly concluded plaintiff was
16 not disabled.
17       Pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 72(b), the
18 parties shall have ten (10) days from service of this Report and Recommendation to file written objections
19 thereto. <u>See also</u> Fed. R. Civ. P. 6.  Failure to file objections will result in a waiver of those objections for
20 purposes of appeal. <u>Thomas v. Arn</u>, 474 U.S. 140 (1985).  Accommodating the time limit imposed by Fed.
21 R. Civ. P. 72(b), the clerk is directed set this matter for consideration on **July 29, 2005**, as noted in the
22 caption.
23       DATED this 30th day of June, 2005.
24
25
26                                          /s/ Karen L. Strombom
27                                          Karen L. Strombom
                                         United States Magistrate Judge
28